IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SIESTA VILLAGE MARKET, LLC,       §
d/b/a SIESTA MARKET, et al.,      §
                                  §  Civil Action No. 3:06-CV-0585-D
                    Plaintiffs,   §  (Consolidated with Civil Action
                                  §    No. 4:06-CV-0232-D)
VS.                               §
                                  §
RICK PERRY, Governor of Texas,    §
et al.,                           §
                                  §
                    Defendants.   §

FITZWATER, Chief Judge:

These are consolidated actions in which plaintiffs challenge
various provisions of the Texas Alcoholic Beverage Code ("Code") as
unconstitutional under the dormant Commerce Clause because they
preclude out-of-state wine retailers from selling and shipping wine
to Texas consumers. Intervenors—two Texas-licensed wine
wholesalers—defend the constitutionality of the challenged Code
provisions, and they assert claims arising from an agreed
preliminary injunction ("Agreed Injunction") entered into by
certain plaintiffs and the Administrator of the Texas Alcoholic
Beverage Commission ("TABC") that allows out-of-state retailers to
ship wine directly to Texas consumers. The court concludes that
Texas' ban on the sale and shipment of wine by out-of-state
retailers to Texas residents is unconstitutional, but it also holds
that the requirement that wine retailers—including out-of-state
retailers—first purchase such wine from Texas-licensed wholesalers
is constitutional.

Plaintiffs the Siesta Village plaintiffs[1] and the Wine Country plaintiffs[2] challenge the constitutionality of various Code provisions on the ground that they preclude out-of-state wine retailers from selling and shipping wine to consumers located in the state of Texas. The Code sections at issue are Tex. Alco. Bev. Code §§ 6.01, 6.03, 11.01, 11.03, 11.46(a)(11), 11.61(b)(19), 22.01, 22.03, 24.01, 24.03, 41.01, 54.12, 107.05(a), 107.07(a), 107.07(f), and 109.53 (Vernon 2007 & Supp. 2007-08). Insofar as relevant to this litigation, these provisions ban the sale and shipment of wine by out-of-state retailers to Texas consumers, and they impose permit and citizenship requirements on wine retailers that plaintiffs maintain are unconstitutional as applied to out-of-state retailers. They also ban the importation of wine by Texas residents, except in limited quantities for personal use. The Siesta Village plaintiffs and the Wine Country plaintiffs contend that these laws discriminate against interstate commerce, in violation of the dormant Commerce Clause.

---

[1]The Siesta Village plaintiffs consist of plaintiffs Siesta Village Market, LLC, a wine retailer located in the state of Florida, and Ken Travis, Ken Gallinger, Maureen Gallinger, and Dr. Robert Brockie, consumer residents of the state of Texas.

[2]The Wine Country plaintiffs consist of plaintiffs Wine Country Gift Baskets.com, K&L Wine Merchants, and Beverages & More, Inc., wine retailers located in the state of California, and David L. Tapp, Ronald L. Parrish, and Jeffrey R. Davis, consumer residents of the state of Texas.

The defendants are John T. Steen, Jr., Gail Madden, and Jose Cuevas, Jr., who are sued in their official capacities as TABC Commissioners; Alan Steen ("Steen"), sued in his official capacity as Administrator of the TABC; and Rick Perry ("Governor Perry") and Greg Abbott ("General Abbott"), sued in their official capacities as Governor and Attorney General of Texas, respectively.

Intervening on behalf of the Texas regulatory scheme are TABC-licensed wholesalers Glazer's Wholesale Drug Company, Inc. ("Glazer") and Republic Beverage Company ("Republic"). Glazer and Republic have also filed a cross-claim against Steen[3] and counterclaims against plaintiffs. Essentially, they defend the constitutionality of the Code provisions that plaintiffs challenge, and they complain that defendant Steen has violated their rights under the Equal Protection Clause and Commerce Clause through a policy of not enforcing the Code against out-of-state wine retailers and by entering into the Agreed Injunction.[4]

The sale, shipment, and delivery of wine in Texas is governed by the Code, Tex. Alco. Bev. Code §§ 1.01-251.82 (Vernon 2007 &

---

[3]Although the cross-claim refers to all defendants, only Steen answered the cross-claim, and it is clear from the record that he is the only defendant whom Glazer and Republic intended to include as a defendant.

[4]The cross-claim against Steen is only based on the Agreed Injunction. Glazer and Republic also complain in their summary judgment briefing that, before the Agreed Injunction was entered, the TABC adopted a policy of not enforcing the Code against out-of-state retailers.

Supp. 2007-08).  Like other states, Texas regulates the sale and importation of most alcoholic beverages——including wine——through a three-tier system.  Producers of alcoholic beverages must be licensed by the TABC and are legally able to sell in Texas only to TABC-licensed[5] wholesalers, who in turn may only legally sell to TABC-licensed retailers, who may then legally sell to Texas consumers.  The Code makes an exception for wine producers or for wineries who hold either a TABC winery permit or a TABC out-of-state winery direct shipper permit that allows them to sell directly to Texas consumers without selling first to a licensed wholesaler or retailer.

Various Code provisions forbid anyone from holding a TABC permit or otherwise selling wine in Texas who has not been a Texas citizen for at least one year.  *See* Tex. Alco. Bev. Code §§ 6.03, 11.46(a)(11) 11.61(b)(19), 24.01(c), and 109.53.  These provisions have been declared unconstitutional as applied to wholesalers located within the state of Texas for less than one year.  *S. Wine & Spirits of Tex. v. Steen*, 486 F.Supp.2d 626, 633 (W.D. Tex. 2007).  As the court explains *infra* in § III(B), their constitutionality has not yet been determined as to out-of-state retailers.

---

[5]The Code distinguishes a "permit" (for wine and spirits) from a "license" (for beer only).  *See* Tex. Alco. Bev. Code §§ 11.01(a) and 61.01 (Vernon 2007).  Because the parties use the terms "permit" and "license" interchangeably, the court will do so as well.

Through provisions separate from the citizenship requirements, the Code also allows in-state retailers to sell and ship wine to Texas consumers, but the Code denies this right to out-of-state retailers. *See* Tex. Alco. Bev. Code §§ 22.03, 24.03, 54.12, and 107.07(f). With limited exceptions, the Code also forbids consumers from purchasing wine from out-of-state retailers. *See id.* §§ 107.05(a) and 107.07(a).[6]

After the Wine Country plaintiffs filed their lawsuit, they and defendant Steen entered into the Agreed Injunction, which permits out-of-state retailers to ship wine directly to Texas consumers.[7] In addition to siding with defendants in defending the regulatory scheme, intervenors Glazer and Republic complain that the Agreed Injunction is detrimental to the public interest of the State of Texas ("State"). They maintain that the Agreed Injunction undermines the State's temperance concerns, causes the State to lose tax revenues, and undermines the State's orderly markets by not requiring out-of-state retailers to comply with the regulations imposed on in-state retailers. Glazer and Republic also bring a cross-claim against defendant Steen, alleging that the

---

[6]These provisions have been declared unconstitutional as applied to purchases from out-of-state wine producers. *See Dickerson v. Bailey,* 336 F.3d 388, 397, 402-03 (5th Cir. 2003).

[7]The parties entered into the Agreed Injunction before these two cases were consolidated. Another judge of this court approved the agreed relief before transferring to the undersigned's docket the case in which the Agreed Injunction was entered.

TABC lacked authority to contradict the legislative requirements of the Texas three-tier system when the parties entered into the Agreed Injunction. Glazer and Republic contend that by not enforcing Texas law against out-of-state retailers, the TABC has compromised the business interests of alcoholic beverage wholesalers, and that the discriminatory enforcement of the Code against in-state retailers has only provided a competitive advantage to out-of-state businesses. Glazer and Republic complain that such conduct amounts to an unequal application of state law, and thus violates their rights under the Commerce Clause and Equal Protection Clause. Based on their cross-claim, they request that the Agreed Injunction be vacated. Glazer and Republic also bring counterclaims requesting that the court declare that the Code provisions that plaintiffs challenge as unconstitutional are in fact constitutional and valid components of the Texas three-tier system.

The following motions are pending for resolution and have been orally argued: (1) intervenors' April 26, 2007 motion to dissolve the Agreed Injunction; (2) the Siesta Village plaintiffs' May 29, 2007 motion (as corrected June 8, 2007) for summary judgment; (3) intervenors' June 28, 2007 motion (as amended June 29, 2007) for summary judgment as to the consolidated plaintiffs' claims and as to intervenors' counterclaims; (4) intervenors' June 28, 2007 motion (as amended June 29, 2007) for summary judgment as to their

cross-claim against defendant Steen; (5) defendants' June 29, 2007 motion for summary judgment on plaintiffs' claims; (6) defendant Steen's June 29, 2007 motion for summary judgment on intervenors' cross-claim; (7) the Wine Country plaintiffs' June 29, 2007 motion for summary judgment on the Wine Country plaintiffs' claims; and (8) the Wine Country plaintiffs' June 29, 2007 motion for summary judgment on intervenors' counterclaims.[8]

II

Before reaching the merits of plaintiffs' constitutional claims, the court must consider certain preliminary questions, the first of which is an Eleventh Amendment immunity defense that defendants raise on behalf of Governor Perry and General Abbott.

A

When state officials such as Governor Perry and General Abbott are sued in their official capacities, they assume the identity of the state that employs them and thus share the state's Eleventh Amendment immunity from private suits. *See Hafer v. Melo*, 502 U.S. 21, 26-27 (1991). The doctrine of *Ex Parte Young* carves out a narrow exception to this general grant of immunity and permits private parties to obtain injunctive relief against state officers for violations of federal law. *P.R. Aqueduct & Sewer Auth. v.*

---

[8]The parties seek to exclude portions of the summary judgment evidence. Because the court has not relied on the challenged evidence in deciding these motions, it denies these requests as moot.

*Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). But

> [i]n making an officer of the state a party
> defendant in a suit to enjoin the enforcement
> of an act alleged to be unconstitutional, it
> is plain that such officer must have *some
> connection* with the enforcement of the act, or
> else it is merely making . . . the state a
> party.

*Ex Parte Young*, 209 U.S. 123, 157 (1908) (emphasis added).

The Fifth Circuit has reaffirmed the nexus requirement between the statute being challenged and the state officer's duty to enforce it. *See Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001) (en banc) (holding that *Young* "exception only applies when the named defendant state officials have *some connection with the enforcement of the act* and 'threaten and are about to commence proceedings' to enforce the unconstitutional act." *Id.* (emphasis in original) (quoting *Young*, 209 U.S. at 155-56)). "Thus, any probe into the existence of a *Young* exception should gauge (1) the ability of the official to enforce the statute at issue under his statutory or constitutional powers, and (2) the demonstrated willingness of the official to enforce the statute." *Id.* at 417. The plaintiffs in *Okpalobi* sued the Louisiana Governor and Attorney General to enjoin enforcement of a state statute. *Id.* at 409. While the statute being challenged "on its face, [did] not direct the State or its officers to do anything," a Fifth Circuit panel held that the suit against the Governor and Attorney General fit within the *Young* exception, because each had a general duty to

uphold and enforce state law. *Id.* at 417. The *en banc* Fifth Circuit reversed and dismissed the state officials from the suit, holding that the panel had erred in interpreting *Young* as relaxing the "special charge" requirement of *Fitts v. McGhee*, 172 U.S. 516, 529 (1899) (dismissing state officials from suit for injunctive relief because neither was specially charged with duty to enforce statute being challenged). *Id.* at 419. "In sum, *Young* does not minimize the need to find an actual enforcement connection——some enforcement power or act that can be enjoined——between the defendant official and the challenged statute." *Id.*

B

Defendants contend that Governor Perry lacks sufficient enforcement powers over the TABC to be a proper defendant in a *Young* suit. The court agrees.

It is clear that Governor Perry's general responsibility to defend the Texas Constitution and the laws of the state falls short of *Fitts*'s "special charge" requirement. The Code broadly commits its enforcement to the three TABC Commissioners. *See* Tex. Alco. Bev. Code §§ 5.02 and 5.31. Although the Code does grant the Governor, with the advice and consent of the Senate, the authority to appoint the Commissioners to six-year terms, *id.* § 5.02, there is no authority granting the Governor control of the actions of the Commissioners once they are appointed. Indeed, the Code severely restricts the grounds to remove a Commissioner. *See id.* § 5.051.

- 9 -

Thus Governor Perry's appointment authority over the Commissioners does not confer on him enforcement power over the TABC.

The Siesta Village plaintiffs point to Governor Perry's authority over Special Inspectors as a sufficient connection to enforcement of the challenged statutes. *See id.* § 5.142(b) (Vernon 2007). But these Special Inspectors are also subject to the orders of the TABC, and only the TABC decides whether Special Inspectors exist at all, *id.* § 5.142(a). Moreover, the Commissioners can remove a Special Inspector at any time for cause. *Id.* § 5.142(e). The Siesta Village plaintiffs do not contend that the Commissioners have appointed anyone as a Special Inspector. Without Special Inspectors, Governor Perry has no enforcement power over the TABC. But even if Special Inspectors do exist, the Code suggests that they serve an ancillary role in enforcing the Code. Their term of service is expressly limited to fewer than two years, they are removable by the TABC at any time for cause, and they are not entitled to take compensation from the State. *See id.* § 5.142(d) and (e). Therefore, Governor Perry's concurrent power over TABC Special Inspectors does not grant him sufficient enforcement power over the TABC to be a proper defendant in a *Young* suit.

Accordingly, the court dismisses Governor Perry as a defendant.

General Abbott, in contrast with Governor Perry, has statutory authority to enforce the Code. Among his powers is the explicit authority to "begin proceedings in district court to restrain [a] person from violating the code or operating under [a] permit or license." *Id.* § 101.01(c). Once the Attorney General obtains an injunction under this provision, the enjoined party's violation of the injunction "operates to cancel without further proceedings any license or permit held by the person." *Id.* To assist in investigating violations, the Code confers on the Attorney General the power to examine the records of any permittee "as often as he considers necessary." *Id.* § 37.12. Section 109.53 of the Code—one of the one-year Texas residency and citizenship provisions that plaintiffs challenge—confers on the Attorney General the authority to sue any company permit holder who is violating the Texas citizenship requirement for cancellation of the company's corporate charter. The court therefore holds that General Abbott is "specially charged" with enforcing the Code.

Defendants contend that even if this is so, it does not entirely resolve the question of General Abbott's amenability to suit under *Young*. *Okpalobi* requires that, in addition to establishing General Abbott's *ability* to enforce the Code, plaintiffs must demonstrate his demonstrated *willingness* to do so. *See Okpalobi*, 244 F.3d at 417. Consistent with this requirement,

the Supreme Court has emphasized that, before *Young* relief is available, "the prospect of [a] state suit must be imminent." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992) ("*Ex parte Young* thus speaks of enjoining state officers '*who threaten and are about to commence proceedings.*'" (quoting *Young*, 209 U.S. at 156) (emphasis in original)). Defendants submit affidavits from two TABC officials who attest that they are not aware of any instance in which the TABC has asked the Attorney General to seek an injunction to enforce the Code. They also point to the Siesta Village plaintiffs' failure to produce evidence that General Abbott has threatened, or shown a willingness, to enforce the Code provisions being challenged.

Defendants' affidavits establish only that the TABC has not requested that the Attorney General exercise his statutory authority to enforce the Code, not that the Attorney General has not done so. The Attorney General's authority to initiate proceedings against those who violate the Code is not contingent on the TABC's approval or request. *See* Tex. Alco. Bev. Code §§ 101.01 and 109.53.

But the court agrees with defendants that General Abbott should be dismissed as a defendant based on their other argument: that the Siesta Village plaintiffs have failed to produce any evidence that General Abbott has threatened to enforce, or has previously enforced, the challenged provisions. Without proof of

- 12 -

General Abbott's willingness to enforce the Code provisions at issue, the Siesta Village plaintiffs cannot rely on *Young* to overcome his Eleventh Amendment immunity. The *Young* doctrine carves out a narrow exception to such immunity, *see P.R. Aqueduct & Sewer Authority*, 506 U.S. at 146, and the Siesta Village plaintiffs have failed to satisfy *Okpalobi*'s "demonstrated willingness" prong for obtaining *Young*-type relief.

Accordingly, the court dismisses General Abbott as a defendant.

## III

The second preliminary question the court must address before deciding the merits of plaintiffs' constitutional claims is defendants' contention that the Texas Legislature's enactment of S.B. 1229, which amended § 22.03 of the Code, and Judge Yeakel's decision in *Southern Wine*, 486 F.Supp.2d 626*,* render moot the constitutional challenges that plaintiffs have pleaded.

### A

"It is well-settled . . . that mootness is a threshold jurisdictional inquiry." *La. Envtl. Action Network v. U. S. Envtl. Protection Agency*, 382 F.3d 575, 580 (5th Cir. 2004) (citing *Deakins v. Monaghan*, 484 U.S. 193, 199 (1988)). "A case is moot if the issues presented are no longer live." *AT&T Commc'ns of the Sw., Inc. v. City of Austin*, 235 F.3d 241, 243 (5th Cir. 2000) (internal quotation marks omitted). "The court looks to the relief

that [the plaintiffs] seek to determine whether their case has become moot." *Wightman-Cervantes v. Texas*, 2005 WL 770598, at *2 (N.D. Tex. Apr. 6, 2005) (Fitzwater, J.).

Plaintiffs ask the court to declare unconstitutional and to enjoin the Code's citizenship requirement, as applied to out-of-state retail permit holders. Defendants concede that S.B. 1229 has no effect on these requirements. Rather, they maintain that *Southern Wine* abrogates them and affords plaintiffs the relief they seek. The State has not appealed the *Southern Wine* decision, and it has committed to this court that it will not enforce the citizenship requirement in the future.

In *Southern Wine* Judge Yeakel of the Western District of Texas declared unconstitutional and enjoined the Code provisions that required the TABC to deny a permit to an applicant for failing to meet the one-year Texas residency and citizenship requirement. *S. Wine*, 486 F.Supp.2d at 633 ("The Court concludes that Texas's one-year durational residency and citizenship statutes fail Commerce Clause scrutiny[.]"). Defendants maintain that there is no indication that they will fail to abide by the injunction in *Southern Wine*, which they contend is sufficiently expansive to include the relief that plaintiffs seek here.

B

The court concludes that defendants have overlooked important differences between *Southern Wine* and the instant litigation, and

- 14 -

that Judge Yeakel's decision does not render plaintiffs' claims moot.

First, the *Southern Wine* plaintiffs were out-of-state wine *wholesalers* who challenged TABC decisions to deny their applications for wholesale licenses based on the Code's one-year citizenship requirement. *Id.* at 628-29. Arguments presented in defense of the Code provisions, and rejected by the *Southern Wine* court, were specifically tailored to the statute's application to wholesalers rather than retailers.[9] *See id.* at 632 ("The one-year durational residency and citizenship statutes fail to pass constitutional muster because the TABC has failed in its burden to prove that no nondiscriminatory alternative means are available to Texas to address the state's interest in ensuring that *those who distribute alcoholic beverages* have a stake in the welfare of the community in which they operate.") (emphasis added)).[10] There is no indication that the *Southern Wine* court considered possible justifications for applying the one-year residency and citizenship requirement to retailers as opposed to wholesalers. Thus *Southern Wine* is not sufficiently broad to cover retailers.

---

[9]In highlighting the retailer-wholesaler distinction, the court is not endorsing the view that retailers and wholesalers are materially different in relation to the Code's citizenship requirements. Instead, it is pointing out that there are components of the rationale for the *Southern Wine* decision that do not apply to retailers and thus distinguish that case.

[10]The court equated distributors with wholesalers. *S. Wine*, 486 F.Supp.2d at 628-29.

Second, unlike the plaintiffs in *Southern Wine*, who formed a Texas corporation to do business in Texas and "intend[ed] to operate facilities physically located in Texas," *id.* at 629, the retailer-plaintiffs in this litigation do not intend to become Texas residents or open stores in this state. Rather, they seek permits to sell wine at retail without becoming Texas residents. Thus while *Southern Wine* strikes down the *one-year* durational residence and citizenship requirement as unconstitutional, these plaintiffs seek a declaration that *any* citizenship requirement is unconstitutional, a question not addressed in *Southern Wine. See id.* at 633.

Although defendants commit not to enforce the Texas citizenship requirement, they offer no authority to suggest that this litigation-position would in all circumstances bind the State or the TABC. Accordingly, the court concludes that plaintiffs' constitutional challenges to the citizenship requirement is not moot.

C

The court considers next the effect of the enactment of S.B. 1229 on this litigation.

Shortly before the summary judgment motions were filed in these cases, the Texas Legislature passed S.B. 1229, which

circumscribes the shipping rights of in-state wine retailers.[11]
Defendants contend that this amendment moots plaintiffs' pleaded
challenge to the pre-amendment direct-shipping provisions of the
Code.[12]

---

[11]As amended, § 22.03(a) provides:

> The holder of a package store permit or wine only package store permit issued for a location within a city or town or within two miles of the corporate limits of a city or town, who also holds a local cartage permit, may make deliveries of and collections for alcoholic beverages off the premises in areas where the sale of the beverages is legal. The permittee must travel by the most direct route and may make deliveries and collections only within the county or the city or town or within two miles of its corporate limits, and only in response to bona fide orders placed by the customer, either in person at the premises, in writing, by mail, or by telegraph or telephone. This section shall not be construed as preventing a holder of a package store permit or wine only package store permit from delivering alcoholic beverages to the holder of a carrier's permit for transportation to persons who have placed bona fide orders and who are located in an area that the holder of a package store permit or wine only package store permit, who also holds a local cartage permit, is authorized to directly deliver to under this section. The holder of a package store permit or wine only package store permit may also deliver alcoholic beverages to the holder of a carrier's permit for transportation outside of this state in response to bona fide orders placed by persons authorized to purchase the beverages.

[12]Defendants do not contend that plaintiffs' challenge to the *amended* version of § 22.03 is likewise moot.

Generally, "[s]uits regarding the constitutionality of statutes become moot once the statute is repealed." *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004). There is an exception, however, when "there is evidence, or a legitimate reason to believe, that the state will reenact the statute or *one that is substantially similar*." *Id.* 849 n.3 (emphasis added) (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993)).

Prior to its amendment, § 22.03 of the Code allowed licensed retailers to ship alcoholic beverages to consumers statewide through the use of a common carrier. *See* Tex. Alco. Bev. Code § 22.03 (Vernon 2006) (amended Sept. 1, 2007) ("This section shall not be construed as preventing a [licensed retailer] . . . from delivering alcoholic beverages to the holder of a carrier's permit for transportation to persons authorized to purchase the beverages); *id.* § 41.01 (providing that carrier permit holder may transport liquor into and out of Texas and between points within the state). Section 107.07(f) of the Code, however, precluded out-of-state entities (except wineries) from shipping wine to consumers within the state.

> Except as provided by Chapter 54, any person in the business of selling alcoholic beverages in another state or country who ships or causes to be shipped any alcoholic beverage directly to any Texas resident under this section is in violation of this code.

Tex. Alco. Bev. Code § 107.07(f) (recognizing that Chapter 54 of the Code authorizes direct retail sale and shipment of wine by out-of-state wine producers). Together, these provisions operated to enable retailers who were physically located in Texas to ship wine to residents throughout Texas, while denying that same right to out-of-state retailers. The recent amendment of § 22.03 circumscribes the shipping rights of an in-state retailer by forbidding it from shipping to a consumer outside the county in which the retailer is located. Amended § 22.03 does not, however, lift the ban on the sale and shipment of wine by out-of-state retailers to Texas residents.

The essence of plaintiffs' constitutional challenge to pre-S.B. 1229 law is that Texas has violated the dormant Commerce Clause by allowing in-state retailers to sell and ship wine to some Texas residents, but denying that same right to out-of-state retailers. Because current law, i.e., § 22.03 as amended by S.B. 1229, has the same alleged defects, it is "substantially similar" to the previous version and does not moot plaintiffs' constitutional challenge. *See Cooper v. McBeath*, 11 F.3d 547, 550-51 (5th Cir. 1994) (holding that Texas Legislature's amendment of Code, while case was on appeal, lowering citizenship requirement from three years to one year did not moot constitutional challenge to three-year requirement). The fact that S.B. 1229 reduces the allegedly discriminatory advantage that in-state retailers have

over their out-of-state counterparts does not moot the case, because "the [law's] practical effect remains the same: Plaintiffs, as non-Texans, are treated differently." *Id.* at 551. Thus there is more than a "'mere risk that [the Texas Legislature] will repeat its allegedly wrongful conduct; it has already done so.'" *Id.* at 550 (quoting *City of Jacksonville*, 508 U.S. at 662)).[13] The court concludes that plaintiffs' claims are not moot.

IV

In addition to challenging the pre-S.B. 1229 version of Texas law, the Siesta Village plaintiffs maintain that the Code as amended is unconstitutional. They assert this challenge for the first time in their response to defendants' motion for summary

---

[13]Defendants attempt to distinguish *Cooper* on the basis that the statutory amendment in *Cooper* occurred while the case was on appeal, not before the district court rendered judgment. But nothing in *Cooper*, *McCorvey*, or *City of Jacksonville* indicates that the substantially-similar-amendment principle applies only to cases in which the amendment occurs while the case is on appeal.

Defendants also cite *Brazos Valley Coalition for Life, Inc. v. City of Bryan, Texas*, 421 F.3d 314 (5th Cir. 2005), in which the Fifth Circuit held that the city's ordinance amendment—enacted prior to the district court's judgment—rendered moot the plaintiffs' constitutional challenge to the pre-amendment ordinances. In that case the amended ordinance materially altered the prior ordinances, and the plaintiffs did "not contend that . . . [the amended ordinance was] itself unconstitutional, just that the City [could not] be trusted not to repeal [the amendment and restore the offending ordinances]." *Id.* at 321-22 (rejecting challenge on grounds that there was "nothing whatever to suggest that the City intend[ed] to [restore the offending ordinances] when th[e] case [was] over"). The present case is distinguishable. Texas has adopted an amended statute that is substantially similar to the prior version and, as the court will explain, is unconstitutional when applied to out-of-state wine retailers.

- 20 -

judgment and in reply in support of their own summary judgment motion. The court must decide whether it can now consider this new claim for relief.

A

1

When a party raises arguments outside the scope of its pleadings, the court construes the arguments as an implicit motion for leave to amend. *See Ganther v. Ingle*, 75 F.3d 207, 211-12 (5th Cir. 1996) (per curiam); *Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972). When the deadline to amend pleadings has expired, a court considering a motion to amend must first determine whether to modify the scheduling order under the Fed. R. Civ. P. 16(b)(4) good cause standard.[14] *See S & W Enters., L.L.C. v. SouthTrust Bank of Ala., N.A.*, 315 F.3d 533, 536 (5th Cir. 2003); *Am. Tourmaline Fields v. Int'l Paper Co.*, 1998 WL 874825, at *1 (N.D. Tex. Dec. 7, 1998) (Fitzwater, J.). If the movant satisfies the requirements of Rule 16(b)(4), the court must next determine whether to grant leave to amend under the more liberal standard of Rule 15(a)(2), which provides that "[t]he court should freely grant leave given when justice so requires." Rule 15(a)(2); *S & W Enters.*, 315 F.3d at 536; *Am. Tourmaline Fields*, 1998 WL 874825, at *1.

---

[14]The restyled Federal Rules of Civil Procedure took effect December 1, 2007. The good cause standard is now found in Rule 16(b)(4), which states that "[a] schedule may be modified only for good cause and with the judge's consent."

The court assesses four factors when deciding whether to grant an untimely motion for leave to amend. *S & W Enters.*, 315 F.3d at 536. First, the court considers the reason for the untimeliness. *Id.* The statutory changes at issue here were enacted on May 25, 2007, well after the January 4, 2007 deadline for seeking leave to amend pleadings, and only four days before the Siesta Village plaintiffs filed their first summary judgment motion. They lacked any opportunity to seek leave to amend before the court-ordered deadline.

The second factor pertains to the importance of the amendment. *Id.* The parties have filed approximately 20 briefs in litigating their respective summary judgment motions, and the court has heard two hours of oral argument. Defendants have relied heavily on the amended version of § 22.03 for their defense, expending considerable effort to support its constitutionality. Likewise, both sets of plaintiffs have vigorously attacked it.[15] Determining the constitutionality of the amended version of § 22.03 is vitally important to this case, because without doing so, it will be impossible to decide one of its central issues: whether out-of-state retailers may sell and ship wine to Texas residents.

---

[15]Although the Wine Country plaintiffs prefer that the court focus solely on the pre-amendment version of the statute, without considering the amended version, they have also advanced ample argument regarding the amended statute's unconstitutionality.

The third and fourth factors involve evaluating the potential for prejudice and the availability of a continuance to cure such prejudice. *Id.* There is little or no potential for prejudice here, because the parties have had a fair opportunity to brief thoroughly the constitutionality of the amended version of § 22.03. No party will have been deprived of a reasonable opportunity to raise available arguments.

The court therefore concludes that all the relevant Rule 16(b)(4) factors favor granting leave to amend. The court discerns no compelling reason to deny granting leave under the more liberal Rule 15(a)(2) standard. Accordingly, treating the Siesta Village plaintiffs' summary judgment briefing as a motion for leave to amend, the court grants the motion.

B

For similar reasons, the fact that the Siesta Village plaintiffs did not challenge § 22.03 in their summary judgment motion does not prevent the court from reaching the merits of the claim. This court has previously declined to consider grounds for summary judgment that were not raised in a party's motion and opening brief. *E.g.*, *Jacobs v. Tapscott*, 2006 WL 2728827, at *7 (N.D. Tex. Sept. 25, 2006) (Fitzwater, J.) ("[T]he court will not consider an argument raised for the first time in a reply brief." (quoting *Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990) (Fitzwater,

J.)), *appeal docketed*, No. 07-10558 (5th Cir. May 22, 2007). But the court retains the discretion to consider such an argument. *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005). "Rule 56(c) merely requires the court to give the non-movant an adequate opportunity to respond prior to a ruling." *Vias Arms, Inc. v. Vias*, 383 F.3d 287, 292 (5th Cir. 2004) (internal quotation marks omitted).

Unlike prior cases in which the court has declined to consider arguments raised for the first time in reply, all parties to this case have been able to thoroughly brief, and orally argue, the ground of relief that the Siesta Village plaintiffs assert for the first time in their response and reply briefs. Consequently, reaching the merits will not deprive any opposing party of an adequate opportunity to respond. The court will therefore address the Siesta Village plaintiffs' constitutional challenge to § 22.03, as amended by S.B. 1229.

V

Having disposed of the preliminary questions presented, the court now turns to the merits of plaintiffs' dormant Commerce Clause challenges to the Code.

A

The Constitution grants Congress the power to "regulate Commerce . . . among the several States[.]" U.S. Const. art. I, § 8, cl. 3. This affirmative grant of power implies a "negative"

or "dormant" constraint on state regulatory authority. *E.g.,*
*Dennis v. Higgins*, 498 U.S. 439, 447 (1991); *John Havlir & Assocs.,*
*Inc. v. Tacoa, Inc.,* 810 F. Supp. 752, 754-55 (N.D. Tex. 1993)
(Fitzwater, J.). "'[T]his negative aspect of the Commerce Clause
prohibits economic protectionism—that is, regulatory measures
designed to benefit in-state economic interests by burdening out-
of-state competitors.'" *Dickerson v. Bailey,* 336 F.3d 388, 395
(5th Cir. 2003) (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454
(1992)).

A statute implicates the dormant Commerce Clause if it
discriminates against interstate commerce "either facially, by
purpose, or by effect." *Allstate Ins. Co. v. Abbott,* 495 F.3d 151,
160 (5th Cir. 2007); *see also John Havlir & Assocs.*, 810 F. Supp.
at 755. The statute's challengers bear the initial burden of
establishing discrimination. *Allstate,* 495 F.3d at 160. If they
carry this burden, the statute will be deemed valid only if the
state shows that the law "advances a legitimate local purpose that
cannot be adequately served by reasonable nondiscriminatory
alternatives." *Granholm v. Heald*, 544 U.S. 460, 489 (2005)
(internal quotation marks omitted); *see also John Havlir & Assocs.*,
810 F. Supp. at 755. A statute that does not discriminate is valid
unless the burden imposed on interstate commerce is "clearly
excessive" in relation to the putative local benefits. *Allstate,*
495 F.3d at 160 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137,

142 (1970)); *John Havlir & Assocs.*, 810 F. Supp. at 755.

These principles apply with equal force to the regulation of alcohol, notwithstanding the adoption of § 2 of the Twenty-first Amendment.[16]  *Granholm,* 544 U.S. at 486 ("[T]he Twenty-first Amendment does not supersede other provisions of the Constitution and, in particular, does not displace the rule that States may not give a discriminatory preference to their own producers.").  The Twenty-first Amendment merely "restored to the States the powers they had" before Prohibition, and served to "constitutionaliz[e] the Commerce Clause framework" that was in existence at that time. *Id.* at 484.  The states were never authorized to discriminate against interstate commerce with respect to alcohol regulations, and the Twenty-first Amendment did not create any new rights to do so.  *Id.* at 484-85.

B

The threshold question in any dormant Commerce Clause analysis is whether the entities between whom the state purportedly discriminates are "similarly situated."  Unless they are, there can be no violation of the dormant Commerce Clause.  *Gen. Motors Corp.*

---

[16]U.S. Const. amend. XXI, § 2:

> The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

*v. Tracy*, 519 U.S. 278, 298-99 (1997).  Two or more entities are similarly situated when there exists "actual or prospective competition between the supposedly favored and disfavored entities in a single market."  *Id.* at 300.

> [If] the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed . . . eliminating the . . . regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors.

*Id.* at 299.

Glazer and Republic maintain that the retailer-plaintiffs are not similarly situated to the in-state retailers with whom they attempt to compare themselves.  They posit that out-of-state retailers are not potential competitors with in-state retailers because Texas has a Twenty-first Amendment right to exclude from competition any retailer who does not participate in its three-tier system.  This argument misunderstands the purpose of the "similarly situated" inquiry.

At this stage of the analysis, the court does not consider whether Texas' exclusion of out-of-state entities from competition is *justified*.  The court addresses this question later, when it determines whether the exclusion is evenhanded and/or necessary to achieve legitimate state objectives.  *See Allstate,* 495 F.3d at 160.  At the present analytical stage, the court asks only whether,

absent Texas' legal barriers to entry, in-state and out-of-state retailers would be in competition. *See Gen. Motors*, 519 U.S. at 298-300. Because the retailer-plaintiffs and in-state wine retailers are engaged in the same business——the sale of wine to retail consumers——and seek access to the same market——Texas consumers——they are potential competitors and are therefore similarly situated for purposes of dormant Commerce Clause analysis.

C

Having determined that out-of-state wine retailers are similarly situated to in-state retailers, the court now considers whether Texas law discriminates against out-of-state wine retailers.

1

As described above, the pre-amendment form of Texas law gave wine retailers who were physically located in Texas the right to ship wine to residents throughout Texas, while denying that right to out-of-state retailers. *See supra* § III(C). Such laws plainly discriminate against interstate commerce. *See Granholm*, 544 U.S. at 474-75 (invalidating laws that required wine producers to establish branch offices or warehouses within state before shipping in in-state commerce, reasoning that physical presence requirements drive up cost of doing business for out-of-state producers, and viewing with "particular suspicion state statutes requiring

business operations to be performed in the home state that could more efficiently be performed elsewhere." (internal quotation marks omitted)). Physical presence requirements "run[ ] contrary to [the Supreme Court's] admonition that States cannot require an out-of-state firm to become a resident in order to compete on equal terms." *Id.* at 475 (internal quotation marks omitted).

The recent amendment of § 22.03 restricts the rights of in-state retailers, but it nevertheless perpetuates the discriminatory regime applied to out-of-state retailers. Amended § 22.03 gives wine retailers located within a Texas county the right to sell and ship wine to consumers within that county. Out-of-state wine retailers cannot sell or ship wine to any Texas consumers at all.

2

The arguments that defendants and intervenors advance in support of the Code's constitutionality are unavailing.

Initially, Glazer and Republic appear to suggest that the law is evenhanded because it gives *all* retailers the right to sell and ship to consumers in their respective counties, regardless whether they are inside or outside the state. In other words, they posit that, just as a wine retailer located in Texas can sell wine at retail in the Texas county in which it is located, a California wine retailer can sell wine within the county *in California* in which it is located. The relevant inquiry for purposes of dormant Commerce Clause analysis, however, is whether a state discriminates

between in-state and out-of-state interests with respect to access to *in-state markets*. *See Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) ("Th[e] negative aspect of the Commerce Clause prohibits economic *protectionism* . . . .") (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74 (1988)) (emphasis added) (internal quotation marks omitted). The Code facially discriminates in this respect, giving in-state wine retailers access to the direct-shipping markets of their respective counties, while denying the same access to out-of-state wine retailers.

Next, defendants maintain that the right to ship within only a single Texas county is too small an advantage to local retailers for the law to be discriminatory, and that the court should focus instead on whether the Code treats in-state and out-of-state interests equally with respect to the right to ship *statewide*. The court disagrees.

The in-state retailers' right to ship within their respective counties of location confers greater benefits than defendants appear to acknowledge. Nothing in the law prevents in-state retail chains with brick-and-mortar locations in multiple counties from shipping to consumers within each such county, provided they ship within the county. Out-of-state retailers have no access to any of these markets. Moreover, even a retailer located within a single Texas county may have a substantial economic advantage over an out-of-state counterpart. For example, several million people (many of

whom are of drinking age) reside in Harris County, whose population exceeds that of 24 states. *See* U.S. Census Bureau, 2006 Population Estimates, http://www.census.gov. Although a Harris County retailer would have access to this market, an out-of-state retailer would not.[17]

And it makes no difference how limited the shipping advantage is for in-state retailers. "[T]here is no '*de minimis*' defense to a charge of discriminat[ion]." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.,* 520 U.S. 564, 581 n.15 (1997) (internal quotation marks omitted). "[A]ctual discrimination, wherever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred." *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 650 (1994). A law that relies on the requirement of a physical, in-state location to afford some retailers the right to sell and ship wine to Texas consumers, while denying the same right to others who are located out-of-state, is

---

[17]Under Supreme Court precedent, it is of no moment that this right is also denied to other in-state retailers (i.e., those located in other counties). *See Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.*, 504 U.S. 353, 355, 361 (1992) (invalidating state law that prohibited landfill operators from accepting solid waste that originated outside county in which their facilities were located, whether or not waste came from outside the state) ("[A] State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself.")).

therefore constitutionally suspect, regardless whether that right expands to the entire state or is restricted to a single county. *See id.* The cases that defendants cite involved evenhanded statutes and actually highlight the reasons why the challenged Code provisions are discriminatory. *See Brooks v. Vassar,* 462 F.3d 341, 354-55 (4th Cir. 2006) (upholding personal importation exception to Virginia's requirement that all alcohol be sold through three-tier system because it "[was] not economic protectionism . . . [but] actually amount[ed] to disadvantage *local* wineries whose wine may only be purchased through [the three-tier system]" (emphasis added)); *Cherry Hill Vineyards, LLC v. Hudgins,* 488 F.Supp.2d 601, 613-14 (W.D. Ky. 2006) (sustaining exception to state's otherwise absolute prohibition on direct shipment on grounds that it was made available to *both* in-state and out-of-state entities).[18]

Defendants also contend that a system designed only to ensure "close proximity transactions" cannot be discriminatory. They rely on a handful of post-*Granholm* decisions that sustain state requirements that all wine sales be made through "face to face" transactions. *See Cherry Hill Vineyard, LLC v. Baldacci,* 505 F.3d

_____

[18]In one of their reply briefs, defendants recast their "de minimis defense" as an argument that the court should look only at substantive, rather than nominal, distinctions between in-state and out-of-state entities. Because the substantive effect of the Code provisions in question is to deny out-of-state retailers access to the direct-shipping market enjoyed by in-state retailers, defendants' change in terminology does not warrant a different result.

28, 35 (1st Cir. 2007); *Jelovsek v. Bresden,* 482 F.Supp.2d 1013, 1022 (E.D. Tenn. 2007); *Hurley v. Minner*, 2006 WL 2789164, at *6 (D. Del. Sept. 26, 2006). Defendants' reliance on these cases is misplaced, because their holdings were based expressly on the fact that the challenged statutes involved evenhanded prohibitions of *all* direct shipping, foreclosing the direct-shipping market to everyone on equal terms. *See Cherry Hill,* 505 F.3d at 35 ("[*Granholm* is distinguishable because] Maine flatly outlaws any and all direct shipping of wine. . . . [T]here is no direct-shipping market; neither in-state nor out-of-state wineries may direct-ship."); *Jelovsek,* 482 F.Supp.2d at 1022 ("Tennessee, by prohibiting [all] shipping . . . creates no specially advantageous State market which is then available only to State residents."); *Hurley,* 2006 WL 2789164, at *6 ("The key fact in the case at bar is that . . . neither in-state nor out-of-state wineries are allowed to deliver wine directly to Delaware residents' homes."). If the challenged statutes had, like those here, "created a direct-shipping market for wine[,] . . . allowed direct shipping on particular conditions, and those conditions were rigged to favor in-state wineries," they would have been unconstitutional. *Cherry Hill,* 505 F.3d at 35 (holding that these characteristics distinguished statutes at issue in *Granholm* from those requiring face-to-face transactions). The cases do not, as defendants suggest, endorse a special interest in "close proximity"

transactions.

In a related argument, defendants assert that out-of-state wine retailers' inability to ship to consumers in Texas is a mere practical consequence of their remoteness from the state, rather than a result of discrimination. The court disagrees. Although an inability to sell wine to Texas consumers in *face-to-face* transactions could be called a practical consequence of a remote location, nothing about a remote location makes it practically impossible to sell *by mail or common carrier.* The inability to ship by mail or common carrier is in fact a *legal* consequence of plaintiffs' remoteness from the state——one that warrants heightened scrutiny under the dormant Commerce Clause.

D

Because plaintiffs have established that the challenged provisions of the Code discriminate against interstate commerce, the "burden [now shifts to] the State to show that the discrimination is demonstrably justified." *Granholm,* 544 U.S. at 492 (emphasis and internal quotation marks omitted). Defendants must demonstrate that the challenged statutes advance a "legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id*. at 489 (internal quotation marks omitted). "The [c]ourt [may uphold] state regulations that discriminate against interstate commerce only after finding, based on concrete record evidence, that a State's nondiscriminatory

alternatives will prove unworkable." *Id.* at 492-93.

Defendants contend that requiring the in-state presence of wine retailers is necessary for protecting Texas' interest in conducting on-site inspections of retailer premises. Acknowledging that the Supreme Court found this interest to be insufficient to justify the discrimination at issue in *Granholm*, *id.* at 492, defendants maintain that the present case is distinguishable because they have developed a superior factual record. The court disagrees.

Although the *Granholm* Court did cite the states' inability to provide a concrete record as a reason for rejecting the proposition that direct shipping circumvents the laws governing underage drinking, it did not rely on this reason to reject the states' proffered interest in on-site inspections. *Compare id.* at 490 ("Without concrete evidence that direct shipping of wine is likely to increase alcohol consumption by minors, we are left with the States' unsupported assertions.") *with id.* at 492 ("These [on-site inspection] objectives can also be achieved through the alternative of an evenhanded licensing requirement . . . . [I]t should be noted that improvements in technology have eased the burden of monitoring out-of-state wineries. Background checks can be done electronically. Financial records and sales data can be mailed, faxed, or submitted via e-mail."). Summarizing its holding that

physical presence requirements do not advance objectives
unattainable by other means, the Court reiterated the lack of
record evidence, but this statement was only a "summary" of its
previous points and did not provide additional grounds for
rejecting the states' proffered need for on-site inspections. *Id.*
at 492. Even if the states did in fact fail to support their
factual assertions about on-site inspections with an evidentiary
record, the Court appears to have assumed *arguendo* the truth of
these assertions and found them to be insufficient nonetheless,
because this was its approach to the unsupported underage drinking
arguments. *See id.* at 490 ("Even were [the Court] to credit the
States' largely unsupported claim that direct shipping of wine
increases the risk of underage drinking, this would not justify
regulations limiting only out-of-state direct shipments."").
Because defendants do not specify any rationale for on-site
inspections that would not have been considered by the Court in
*Granholm* or foreclosed by its reasoning, this justification fails
in the present litigation.

2

The court also finds insufficient the grounds that Glazer and
Republic advance in support of the discriminatory treatment of out-
of-state retailers.

The first of these is that Texas' ban on direct shipping is
necessary to prevent access by minors to alcohol. In rejecting

this justification for discriminatory direct-shipping laws, the *Granholm* Court noted that a "less restrictive step[ ]" to accomplish this objective would be to "require[ ] an adult signature on delivery and a label so instructing on each package." *Id.* at 490-91. Glazer and Republic contend that this alternative would sometimes allow minors to gain access to alcohol (e.g., by a deliveryman's failure to properly verify age), but they offer no evidence that the system is less effective at policing underage drinking than the other methods. Therefore, preventing access to alcohol by minors does not justify Texas' discriminatory direct-shipping laws.

Glazer and Republic's second contention is that the statutes are necessary for achieving Texas' revenue-raising interest. But although Glazer and Republic offer some evidence that Texas has had difficulty collecting taxes on Internet sales generally, they adduce no proof that Texas would encounter difficulty collecting taxes in the context of alcohol sales, where it "could protect itself . . . by requiring a permit as a condition of direct shipping." *Granholm,* 544 U.S. at 491 (citing this less-restrictive alternative as reason to reject states' revenue-raising justification). The absence of such evidence is fatal to their argument.

Glazer and Republic contend, third, that a ban on direct shipping by out-of-state wine retailers is necessary to preserve

Texas' three-tier system, because lifting the restriction would allow wine to enter Texas that had not been funneled through a TABC-licensed wholesaler.    As the court explains *infra* at § VI(A)(3), however, Texas can constitutionally require that wine sold and shipped to Texas consumers be purchased from a Texas-licensed wholesaler.    The court therefore disagrees that the sale and direct shipment of wine would necessarily allow out-of-state retailers to bypass the three-tier system.[19]

---

[19]The court recognizes that this conclusion differs from the recent decision in *Arnold's Wines, Inc. v. Boyle,* 515 F.Supp.2d 401 (S.D.N.Y. 2007).    The *Arnold's Wines* court concluded, based on the Twenty-first Amendment alone, and without conducting a dormant Commerce Clause analysis, that New York had the right to preclude out-of-state wine retailers from selling, delivering, and transporting wine directly to New York consumers because the ban was "an integral part of the three-tier system upheld by the Supreme Court in *Granholm*." *Id.* at 413-14.    The court stated, in pertinent part, that "[b]ecause in-state retailers are the last tier in the State's three-tier system, plaintiffs' challenge to the [law's] provisions blocking out-of-state entities from obtaining licenses to compete at this tier is clearly an attack on the three-tier system itself." *Id.* at 411.    The court respectfully disagrees with *Arnold's Wines*, concluding, *inter alia*, that it is based on a misreading of *Granholm*, and that it elevates a state's rights under the Twenty-first Amendment to a level that improperly supersedes the dormant Commerce Clause.    *Granholm* states, for example, that "State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent." *Granholm*, 544 U.S. at 489.    The laws in question in *Arnold's Wines* do not appear to satisfy that requirement. *Arnold's Wines*, 515 F.Supp.2d at 402 (addressing laws "that reserve to in-state retailers the exclusive right to sell, deliver, and transport wine directly to New York consumers").    Moreover, as the court explains in today's opinion, a state can treat in-state and out-of-state entities on equal terms and still preserve its three-tier system.    Therefore, it does not follow that allowing out-of-state retailers to compete in a state's domestic market "is clearly an attack on the three-tier system itself." *Id.* at 411.

- 38 -

For the foregoing reasons, the court concludes that defendants have failed to establish that Texas' discriminatory direct-shipping laws are necessary to achieve a legitimate state interest. The court therefore holds that the following Code provisions are unconstitutional as applied to out-of-state wine retailers: Tex. Alco. Bev. Code §§ 22.03[20], 24.03, 54.12, and 107.07(f).[21]

E

Based on the foregoing, it follows that the challenged Texas citizenship requirements[22] are also unconstitutional as applied to retailers. If Texas cannot constitutionally condition wine retailer direct-shipping rights on a physical presence within the state, it cannot condition qualification for TABC permits on establishing citizenship in Texas. It also follows that Texas cannot prohibit consumers from purchasing wine from out-of-state retailers who comply with the Code and TABC regulations. Accordingly, the challenged ban on consumer imports of wine embodied in §§ 107.05(a) and 107.07(a) is also unconstitutional.

---

[20]This holding applies to pre-S.B. 1229 law, as well.

[21]The Siesta Village plaintiffs include § 110.053 in their list of challenged statutes, but the court neither perceives, nor do plaintiffs identify, any defect in this provision.

[22]These requirements are set out in Tex. Alco. Bev. Code §§ 6.03, 11.46(a)(11), 11.61(b)(19), 24.01(c), and 109.53. Sections 24.01(c) and 109.53 are implicated with respect to the provisions that incorporate a citizenship requirement.

The court now decides the scope of the relief to which plaintiffs are entitled.

A

Plaintiffs request that the Agreed Injunction be made permanent, or that the court substitute its own injunction giving the retailer-plaintiffs the right to sell and ship wine directly to consumers within Texas. Defendants respond that this relief would improperly allow the retailer-plaintiffs to do business in the state without obtaining TABC permits or complying with the requirement that they purchase wine from a TABC-licensed wholesaler. The Wine Country plaintiffs maintain that this is justified because there are no TABC permits available to out-of-state retailers, the Code's wholesaler-purchase requirement is inapplicable to out-of-state retailers, and, if the wholesaler-purchase requirement in fact applies to out-of-state retailers, it is unconstitutional.

1

Texas law requires that any person who seeks to sell alcohol within the state must first obtain a TABC license or permit. *See* Tex. Alco. Bev. Code §§ 6.01, 11.01. The Wine Country plaintiffs contend that it would be unconstitutional to apply this requirement to them because there are no permits available to out-of-state retailers. They reason that, because the Texas Legislature has not

created a special licensing scheme for out-of-state retailers, as it recently has done for out-of-state wineries, *see* Tex. Alco. Bev. Code §§ 54.01-54.12 (effective May 1, 2005), out-of-state retailers are excluded from participating in Texas' three-tier system. The court disagrees.

The State's mechanism for excluding out-of-state wine retailers from the Texas market is found in the unconstitutional citizenship requirements. Because the court is enjoining enforcement of the citizenship requirements against out-of-state wine retailers, no enforceable Code provisions prevent the retailer-plaintiffs from obtaining TABC permits. The fact that the remaining, constitutional components of the Texas regulatory scheme may be somewhat awkward when applied to out-of-state wine retailers does not require that the Texas Legislature enact a separate system that regulates them. Accordingly, the court holds that the retailer-plaintiffs must first obtain TABC permits before selling and shipping wine to consumers within Texas.

2

The court also holds that the retailer-plaintiffs must purchase from TABC-licensed wholesalers and wineries the wine they sell to consumers within Texas. This requirement is plainly imposed by the Code. *See* Tex. Alco. Bev. Code Ann. §§ 22.01 and 24.01 (Vernon 2007).

The Wine Country plaintiffs contend that this requirement does

not apply to them. They emphasize that it has never been enforced against out-of-state retailers, and they assert that the made-for-litigation interpretation of the law that defendants now advance is entitled to no deference under principles articulated in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 212-13 (1988), and *Thompson v. Goetzmann,* 337 F.3d 489, 502 (5th Cir. 2003).

*Bowen* and *Thompson* do not affect the court's conclusion that the wholesaler-purchase requirement applies to the retailer-plaintiffs. The court is not deferring to the TABC's interpretation of the Code. It is itself interpreting unambiguous statutory provisions. The court therefore concludes that the Code requires the retailer-plaintiffs to purchase from TABC-licensed wholesalers the wine they seek to sell at retail to consumers in Texas.

3

The Wine Country plaintiffs contend that the requirement that they purchase wine for resale from Texas-licensed wholesalers is unconstitutional because it effectively requires their physical presence in Texas. They maintain that California law forbids them from receiving shipments of alcohol from out-of-state wholesalers into the state, which means that to comply with Texas' wholesaler-purchase requirement, they must establish a Texas branch office to receive shipments. The court rejects these arguments.

A decision like today's that invalidates components of a

state's direct-shipment laws does not necessarily call into question the constitutionality of the state's three-tier system. *See Granholm,* 544 U.S. at 488. The Supreme Court noted in *Granholm* that it had "previously recognized that the three-tier system itself is 'unquestionably legitimate.'" *Id.* at 489 (citing *North Dakota v. United States,* 495 U.S. 423, 432 (1990), and *id.* at 447 (Scalia, J., concurring in judgment)). It cited in support of this conclusion Justice Scalia's concurrence in *North Dakota*, in which he wrote: "The Twenty-first Amendment . . . empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler." *North Dakota*, 495 U.S. at 447. And the Court concluded that "State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent." *Granholm,* 544 U.S. at 489.

In requiring that wine retailers purchase their wine for resale from Texas-licensed wholesalers, the Code does not treat in-state retailers more favorably than it does out-of-state retailers. *See* Tex. Alco. Bev. Code Ann. §§ 22.01 and 24.01 (Vernon 2007). In fact, the Code does not contemplate that there will be any wine sales by out-of-state retailers to consumers in Texas. Although a state may not exempt in-state interests from the strictures of its three-tier system while continuing to require out-of-state interests to comply with it, *see, e.g., Granholm,* 544 U.S. at 489,

this is not the case here.  As a result of today's decision, out-of-state retailers are now eligible to obtain permits to sell and ship wine to Texas consumers.[23]  As permittees, they become subject to Code provisions that are part of the three-tier system and that make no distinction between out-of-state and in-state entities.

Nor can the Wine Country plaintiffs avoid this result based on complaints about the practical consequences of imposing the wholesaler-purchase requirement.  If, as is undoubtedly true, Texas can "funnel sales through the three-tier system," *id.*, it can impose the wholesaler-purchase requirement of that system on both in-state and out-of-state wine retailers.  In fact, the Fourth Circuit suggested in *Beskind v. Easley,* 325 F.3d 506 (4th Cir. 2003), that one way to remedy a scheme that discriminated against out-of-state wine manufacturers——who were required to sell through the three-tier system when in-state wine manufacturers were not——was for the state to "require in-state wines to pass through the same three-tiered scheme that all other wines must pass through."  *Id.* at 515.  This is the effect of the Code's wholesaler-purchase requirement in combination with today's decision enabling out-of-state wine retailers to sell to consumers in Texas: the wholesaler-purchase requirement applies to in-state and out-of-state interests alike.  *See Granholm,* 544 U.S. at 489

_____

[23]The Agreed Injunction had this effect, of course, but it afforded only temporary relief.

("State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent."). The Texas wholesaler-purchase requirement is therefore constitutional as applied to out-of-state wine retailers who desire to sell and ship wine to Texas consumers.

4

The Wine Country plaintiffs also argue that Texas does not require that "all" liquor pass through the three-tier system, but has instead made an exception for direct sales by wineries to consumers. Assuming *arguendo* that, at some point, exceptions to the three-tier system——even if equally applied to out-of-state interests——can become sufficiently expansive that they cause the State to lose its right to regulate through that system, this is not such a case. The limited exception afforded under the Code for direct sales by wineries does not permit the conclusion that Texas has relinquished its right to regulate the vast remainder of wine sales through its three-tier system.

The Fourth Circuit's decision in *Brooks* lends support to this conclusion.[24] In affirming the state's right to employ the three-tier system, the court repeatedly acknowledged the existence of other exceptions to that arrangement, including one for direct

---

[24]*Brooks* was written by Judge Niemeyer. Judge Traxler concurred in the opinion except as to Part III(B), and he concurred in the judgment. Judge Goodwin concurred in Parts I, II, and V, and dissented from Parts III and IV. *Brooks*, 462 F.3d at 344.

sales to consumers by wine producers. *Brooks*, 462 F.3d at 345, 349, 350 n.2 (maj. op.); *id.* at 352 n.3 (Niemeyer, J., concurring). Significantly, the existence of these exceptions did not affect the court's conclusion that Virginia could require that all other alcohol sales be made through the three-tier system. The state's interest in using that system apparently had not been undermined.

The court therefore concludes that Texas has not relinquished its interest in the three-tier system by making a limited exception for direct sales by wineries.

5

Finally, plaintiffs' arguments criticizing the three-tier system are—to the extent the regime is constitutional—more appropriately directed to the Texas Legislature. *See, e.g., Ewing v. California,* 538 U.S. 11, 28 (2003) ("[Federal courts] do not sit as a 'superlegislature' to second-guess [state] policy choices."). Similarly, it is not controlling that some of the policy rationales for making exceptions for wineries might support a decision to craft similar exceptions for retailers, because plaintiffs do not contend that they are constitutionally entitled to the same treatment as are wine producers.

B

Because the retailer-plaintiffs may not sell and ship wine to Texas consumers without first obtaining TABC permits or purchasing their wine from a Texas-licensed wholesaler, they are not entitled

to injunctive relief that enables them to circumvent these requirements. The court must instead fashion a remedy that relieves them only from complying with the unconstitutional provisions of the Code. Accordingly, the court enjoins enforcement of the Code's Texas citizenship requirements as applied to out-of-state wine retailers, and it enjoins enforcement of the ban on imports as applied to Texas consumers who seek to purchase wine from out-of-state retailers, and as applied to entities who would be barred by its provisions from delivering wine to Texas consumers.

As to the direct-shipping laws, there is some dispute about the appropriate scope of the injunction. Plaintiffs request that the court enjoin enforcement of only those provisions that prohibit out-of-state retailers from shipping wine to Texas consumers. By contrast, Glazer and Republic argue that the court should nullify the direct-shipping rights currently enjoyed by in-state retailers, rather than extending those benefits to out-of-state retailers. Defendants, for their part, appear to prefer a remedy that would allow out-of-state interests to sell and ship wine only to a single Texas county.

Two basic principles guide the court's resolution of this dispute. First, mindful of its institutional role, the court must resist invitations to engage in legislative policymaking. *See, e.g., Ewing,* 538 U.S. at 28 ("[Federal courts] do not sit as a

'superlegislature[.]'"); *Dickerson,* 336 F.3d at 408-409 ("We must decline the . . . invitation to assume the mantle of super legislature, actively rewriting substantial portions of the [Code] under the guise of validating a Commerce Clause challenge.") (invalidating statutory regime that afforded direct sale and shipment rights exclusively to in-state wineries).

Second, discriminatory direct-shipping laws should be cured by extending rights to out-of-state retailers rather than by increasing restrictions on in-state retailers. *See Dickerson,* 336 F.3d at 407-09 (enjoining enforcement of statutory provisions that denied shipping rights to out-of-state wineries rather than eliminating provisions that granted such rights to in-state wineries) ("[T]he extension of benefits, not the extension of burdens——is [the goal] inherent in a claim under the Commerce Clause . . . . [A] Commerce Clause claim can only be redressed in the form of *eliminating* discriminatory *restrictions* that have been imposed on out-of-state interests.") (emphasis in original)).[25]

Applying these principles, the court enjoins enforcement of §§ 54.12 (generally forbidding out-of-state entities from shipping to Texas consumers) and 107.07(f) (same) as applied to out-of-state wine retailers. It also enjoins, as applied to out-of-state wine

---

[25]Glazer and Republic maintain that the court should follow the Fourth Circuit's contrary holding in *Beskind,* 325 F.3d at 519. They do not, however, provide any basis for distinguishing *Dickerson,* which is binding in this circuit.

retailers, the enforcement of the in-county shipping limitation found in §§ 22.03 and 24.03.[26]  The Agreed Injunction is hereby dissolved and is replaced by the more limited injunctive relief set out in the judgment filed today.[27]

VII

Finally, the court turns to Glazer's and Republic's counterclaims against plaintiffs and cross-claim against Steen.

A

Glazer's and Republic's counterclaims and cross-claim consist of three counts.  In count I, intervenors complain that the Agreed Injunction and plaintiffs' requested relief violates Texas' three-tier system, compromises Glazer's and Republic's business interests and customer relationships, gives an unregulated class of out-of-state importers an unfair competitive advantage, and creates a discriminatory preference for wine over other alcoholic beverages.

---

[26]While the court recognizes that enjoining §§ 22.03 and 24.03 only as to out-of-state wine retailers results in statewide shipping rights for out-of-state retailers without a concomitant expansion of statewide shipping rights for in-state wine retailers, the in-county shipping limitation has not been deemed unconstitutional as applied to Texas retailers, so it would be improper for the court to enjoin its enforcement as to them.  *See Dickerson,* 336 F.3d at 407 (enjoining enforcement of unconstitutional direct-shipping laws only as applied to out-of-state wineries, which was the only application held to be unconstitutional); *United States v. Faasse,* 265 F.3d 475, 487 n.10 (6th Cir. 2001) (recognizing that wholesale invalidation of statute "is reserved only for when there are no set of circumstances in which the statute's application would be constitutional").

[27]In view of this disposition, the court denies intervenors' April 26, 2007 motion to dissolve the Agreed Injunction as moot.

They allege that they are being deprived of their right and privilege to engage in interstate commerce under the three-tier system. And they aver that the Agreed Injunction violates their rights under the Commerce Clause and the Equal Protection Clause of the Fourteenth Amendment by preferring one form of interstate commerce over another, and by depriving them of the evenhanded and nondiscriminatory application and administration of state law.

In count II, Glazer and Republic request a judgment declaring the rights and duties of plaintiffs, defendants, and intervenors. They also ask the court to declare that the challenged Code sections are constitutionally valid provisions of the three-tier system, that out-of-state retailers must purchase alcohol from Texas in-state, licensed wholesalers, and that enforcement of these requirements against out-of-state retailers like plaintiffs is constitutional.

In count III, intervenors aver that any different treatment imposed by Texas law on the manner in which wine is sold by licensed retailers to Texas consumers is constitutional and/or immunized from Commerce Clause scrutiny by the Twenty-First Amendment and/or the Webb-Kenyon Act, 27 U.S.C. § 122. They request that, if the court determines that any portion of the Code is unconstitutional, it limit the remedy to eliminating only those elements that constitute unconstitutional discrimination, while expressly declaring the continuing validity of the other Code

provisions that plaintiffs challenge.

In their prayer for relief, Glazer and Republic request, in pertinent part,[28] that the court deny the relief that plaintiffs request, and that it enter judgment against plaintiffs, vacate the Agreed Injunction, and declare that the challenged Code provisions are constitutional and that alcohol must pass through a licensed, in-state Texas wholesaler before it can be sold at retail to Texas consumers. Alternatively, they ask that, if the court determines that the Code is in any respect unconstitutional, it enter limited injunctive relief that addresses these infirmities rather than order the expansive remedies that plaintiffs seek.

B

In the exercise of its discretion, the court dismisses Glazer's and Republic's claims for declaratory judgment relief. Because, in the context of plaintiffs' claims, the court has fully considered and addressed the issues and arguments that Glazer and Republic present, addressing the claims anew in the context of a declaratory judgment counterclaim and cross-claim would be wholly redundant. The court therefore denies the requested relief. *See, e.g., Kougl v. Xspedius Management Co. of Dallas/Fort Worth, L.L.C.,* 2005 WL 1421446, at *4 (N.D. Tex. June 1, 2005) (Fitzwater, J.) (exercising discretion to dismiss declaratory judgment

---

[28]An example of the other relief they request is a right of limited discovery in this litigation.

counterclaim on grounds that it raised issues already presented in lawsuit).

C

Glazer and Republic also seek declaratory relief and vacatur of the Agreed Injunction based on alleged violations of their rights under the dormant Commerce Clause and the Equal Protection Clause.

As the court has already explained, the dormant Commerce Clause operates to forbid "economic *protectionism*—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Wyoming*, 502 U.S. at 454 (quoting *New Energy Co.*, 486 U.S. at 273-74) (emphasis added) (internal quotation marks omitted). Glazer and Republic cite no authority for the proposition that the dormant Commerce Clause is implicated where a state grants preferential treatment to *out-of-state* interests. The court therefore dismisses intervenors' Commerce Clause claim.

The claim that Glazer and Republic bring for violating their rights under the Equal Protection Clause also fails. They make no attempt to demonstrate that they are similarly situated to the entities who they contend are receiving preferential treatment. This is fatal to their claim. *See, e.g., Beeler v. Rounsavall,* 328 F.3d 813, 816 (5th Cir. 2003) ("[Under] standard equal protection analysis . . . the plaintiff must [first] prove that similarly

situated [entities] were treated differently.") (internal quotation marks omitted)).

Accordingly, the court dismisses with prejudice the counterclaims and cross-claim of Glazer and Republic.

*     *     *

In sum, the court denies intervenors' April 26, 2007 motion to dissolve the Agreed Injunction as moot; grants in part and denies in part the Siesta Village plaintiffs' May 29, 2007 motion (as corrected June 8, 2007) for summary judgment; denies intervenors' June 28, 2007 motion (as amended June 29, 2007) for summary judgment as to the consolidated plaintiffs' claims and as to intervenors' counterclaims; denies intervenors' June 28, 2007 motion (as amended June 29, 2007) for summary judgment as to their cross-claim against defendant Steen; denies defendants' June 29, 2007 motion for summary judgment on plaintiffs' claims; grants defendant Steen's June 29, 2007 motion for summary judgment on intervenors' cross-claim; grants in part and denies in part the Wine Country plaintiffs' June 29, 2007 motion for summary judgment on the Wine Country plaintiffs' claims; and grants the Wine Country plaintiffs' June 29, 2007 motion for summary judgment on intervenors' counterclaims.

The court declares the regime embodied in the following provisions to be unconstitutional as applied to out-of-state wine retailers: §§ 6.03, 11.46(a)(11), 11.61(b)(19), 22.03 (version

before it was amended in 2007), 22.03 (current version), 24.01(c), 24.03, 54.12, 107.05(a), 107.07(a), 107.07(f), and 109.53.  To remedy the constitutional violations, the court——as applied to out-of-state wine retailers——enjoins enforcement of the Texas citizenship requirements embodied in §§ 6.03, 11.46(a)(11), 11.61(b)(19), 24.01(c), and 109.53; enjoins the ban on sale and shipment of wine contained in §§ 54.12 and 107.07(f); and enjoins the in-county shipping limitation imposed by §§ 22.03 and 24.03. The court also enjoins enforcement of §§ 107.05(a) and 107.07(a), as applied to Texas consumers who seek to purchase wine from out-of-state retailers, and as applied to entities who would be barred by those provisions from delivering wine to Texas consumers.

The effect of today's opinion and judgment is this:  Out-of-state wine retailers——including the wine retailers among the Siesta Village plaintiffs and the Wine Country plaintiffs——may now sell and ship wine to Texas residents, provided the retailers first obtain the necessary TABC permits and otherwise comply with provisions of Texas law that the court has not enjoined, including the requirement that they purchase the wine from a Texas-licensed wholesaler.  Texas-resident wine consumers——including wine consumers among the Siesta Village plaintiffs and the Wine Country

plaintiffs——may now, in addition to the limited quantity of wine for personal use allowed under § 107.07(a), import wine for personal use, without being required to hold their own permit, provided they purchase the wine from a retailer who holds a Texas permit.

**SO ORDERED.**

January 14, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE